IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22-CR-281 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| RUEBEN SCHWARTZ, | ) | GOVERNMENT'S MOTION TO |
| | ) | REVOKE ORDER OF RELEASE |
| Defendant. | ) | |

The United States of America, by and through counsel, Michelle M. Baeppler, First Assistant United States Attorney, and Robert J. Kolansky and Elliot Morrison, Assistant United States Attorneys, hereby moves this Court to revoke the order of release issued by Magistrate Judge Kathleen B. Burke on May 26, 2022 (R. N/A: Minutes Entry, May 26, 2022), and detain Defendant pending trial.

I.  **INTRODUCTION**

Defendant Rueben Schwartz has repeatedly engaged in violent conduct related to his business dealings. Among other things, he has warned one witness that she could end up buried on his property, and propositioned another witness to kill the federal task force officer leading the investigation of Schwartz's criminal conduct—the same officer that Defendant bragged about intimidating in a recorded conversation. In a thorough detention hearing, the United States presented clear and convincing evidence that no combination of conditions exist that would reasonably assure the safety of the community or Defendant's appearance, and demonstrated that there is a serious risk that Defendant will further attempt to obstruct justice, including by threatening or injuring prospective witnesses. While Magistrate Burke's release order required home confinement with electronic monitoring, there is no evidence that those conditions would

do anything to stop Defendant from arranging for others to carry out his threats and violence for him—as he has done in the past.

## II.     BACKGROUND AND PROCEDURAL HISTORY

### A.     THE INVESTIGATION AND CHARGES

Defendant was charged via criminal complaint on May 18, 2022 with engaging in money laundering transactions based on a thorough affidavit. (Doc. 1: Criminal Complaint; Doc. 1-2: Redacted Complaint Aff. (hereinafter, "Aff."), PageID 13-23). The following week, on May 25, 2022, a federal grand jury in the Northern District of Ohio returned a one-count indictment charging Defendant with one count of Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(h). (Doc. 12: Indictment).

These charges stem from related investigations conducted by the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), and the Conneaut Police Department ("CPD"). Defendant first came to law enforcement's attention in relation to an investigation of an arson and related insurance and mail fraud. Defendant is alleged to have conspired with others to burn down a restaurant, owned by Defendant's business, R&E Growth Properties Ltd ("R&E"), to obtain insurance payouts well above the actual value. During the detention hearing, detailed further below, FBI Special Agent Jason Watson outlined the arson investigation. (Doc. 18: Det. Hrg. Trans., Page ID 85-88, 90-92, 96-99, 108-112).

While the arson/fraud investigation was pending, Defendant sold several properties to Marc Mahoney,[1] the target of a large-scale cocaine trafficking investigation conducted by the

---

[1] Marc Mahoney ("Mahoney"), who purchased the properties identified as 247 Main and 180/182 Park, was indicted on February 17, 2022 in the Northern District of Ohio (1:22-cr-00057-PAB-1) for Possession with Intent to Distribute Controlled Substances (Title 21 U.S.C. Section 841(a)) and Possession with Intent to Distribute Controlled Substances and Conspiracy (Title 21 U.S.C. Section 846). A trial date has not been set. Mahoney previously

DEA, in return for cocaine sales proceeds. As detailed further below, Defendant conspired with Mahoney and Conspirator 1 to sell Mahoney several properties, for cash, while under-representing the value of the sales on the sales agreements.

During the course of these parallel investigations, law enforcement learned that Defendant issued several threats of violence against individuals with knowledge of his criminal conduct, or who owed him money. Likewise, investigators discovered that Defendant offered $100,000 to Person 2 in exchange for killing Conneaut Detective/DEA Task Force Officer Taylor Cleveland, who was leading the investigation of Defendant's criminal conduct. (*Id.*, PageID 98).

On May 19, 2022, the FBI executed a search warrant at Defendant's residence in Conneaut, Ohio. During the search, investigators seized significant quantities of electronic and documentary evidence, which is still being reviewed and processed. Additionally, while searching Defendant's residences, investigators observed an estimated 45-60 firearms. Those firearms were not seized at the time because the defendant was not prohibited from possessing them. Additionally, during the detention hearing, Special Agent Watson explained the following regarding the pattern he had observed in which Defendant "gets others to do his criminal work" (*id.*, PageID 115), including threats of violence and murder:

> So what I've learned from my investigation, both in the arson case as well as the money laundering case, dating back to 2018 when Person 2 was with Mr. Schwartz, Schwartz is directing somebody

---

pleaded guilty in 2004 to federal drug distribution charges, in 1998 and 2000 to state drug distribution charges, and to state attempted forgery charges in 2002. On the date of Mahoney's arrest on January 20, 2022, the DEA seized $170,880.00 in United States Currency and 22 kilograms of cocaine from Mahoney's residence. The DEA also seized $2,399,585.00 in United States Currency from a self-storage facility in Cleveland, OH which was associated with Mahoney and a co-defendant. (Aff., Pg. 3).

3

else to be the one to shoot the person that they had a dispute, a financial dispute with.

Fast forward, and it was Schwartz -- we didn't get into this, but Schwartz offered Person 2 $50,000 to burn down the commercial building. Schwartz convinces Ryan Anderson, his business partner, to burn down the building.

And it's a pattern. And then, Schwartz offers Person 2 $100,000 to shoot and kill Detective Taylor Cleveland, and that also -- all those factors were things that I took into consideration.

When deciding that -- whether to seek to seize firearms in his home, I chose not to because it's clear to me that that is not going to solve the problem of keeping my witnesses safe or Detective Taylor Cleveland safe because Mr. Schwartz is [unintelligible] going to have somebody else do the job.

(Doc. 18: Det. Hrg. Trans., Page ID 124-25).

      B.      DETENTION HEARING AND ORDER OF RELEASE.

On May 19, 2022, Defendant appeared for his initial appearance before Magistrate Judge Kathleen B. Burke. The United States moved for pretrial detention. On May 26, 2022, Magistrate Judge Burke held a detention hearing. At the hearing, the parties agreed that the money laundering charge does not give rise to a rebuttable presumption of detention. (Doc. 18: Det. Hrg. Trans., Page ID 83).

      1.      The United States' Evidence

The United States proffered the criminal complaint affidavit and the Pretrial Services report. (*Id.*, PageID 83-84). The United States called FBI Special Agent Jason Watson to present testimony regarding Defendant's alleged money laundering, alleged arson and related fraud, and his numerous violent threats against individuals, including the CPD Detective (also a DEA Task Force Officer) leading the investigation of his criminal conduct.

4

Special Agent Watson explained that, in relation to the alleged arson, Defendant threatened an individual referred to in the complaint affidavit as Person 3:

> **Q** So, Mr. Watson, as a result of the investigation of this arson and the related money laundering, did you come to learn of threats that the defendant had made to a potential witness?
>
> **A** I did.
>
> And the witnesses -- I'm going to go into detail. So the witnesses are both witnesses in the arson insurance fraud case as well as the money laundering case.
>
> **Q** And did one of those threats refer to the possibility that if things went badly specifically as to the arson that this witness would end up dead, in essence?
>
> **A** Yes. Person 3, as identified in the complaint, had explained to me of a threat that Mr. Schwartz had made against her, . . . which he had said, along the lines of, if this goes bad for me related to the arson, you're going to end up somewhere on my property, and she understood it as she would be killed.
>
> **Q** And to end up on the property, meaning buried there somewhere?
>
> **A** Correct. And dead. Yes.

(*Id.*, PageID 86-87). Importantly, Special Agent Watson explained that Defendant made incriminating statements to Person 3 regarding both the alleged arson and the alleged money laundering (*see, e.g.*, id., PageID 34-35, 125; see also Aff., Pg. 7-8), giving rise to Defendant's motivation to persuade Person 3 not to cooperate with police.

Additionally, Special Agent Watson explained that Defendant tried to hire Person 2 to kill DEA Task Force Officer Taylor Cleveland shortly after Cleveland interviewed Defendant. Special Agent Watson testified as follows:

> **Q** Special Agent Watson, can you describe for the Court the context in which you learned of an attempt to hire someone to kill an investigator who was investigating the defendant.
>
> **A** Yes.
>
> Person Number 2, as outlined in the complaint, had provided information to law enforcement in -- at the end of February of 2022. It was approximately one week after Detective Taylor Cleveland from the Conneaut Police Department interviewed Rueben Schwartz, along with DEA agents.
>
> Person Number 2 advised that he had met with Rueben Schwartz at his property and Mr. Schwartz told Person 2 to leave his phone locked up in a toolbox and they moved away from that area. Mr. Schwartz asked Person 2 if he was still his friend. Person 2 said yes. Mr. Schwartz said: Do you want to make some money, some real money? And Person 2 said: Of course. A hundred thousand dollars. Mr. Schwartz said: A hundred thousand dollars, and then said the words -- the words Taylor Cleveland and used his hand to mimic a gun shooting at his head.
>
> And Person 2 affirmed that they continued to speak, where Mr. Schwartz stated again his offer to pay Person 2 $100,000 to kill Detective Taylor Cleveland because of the investigations that Detective Cleveland was participating in against Mr. Schwartz and his businesses, which includes both the money laundering and the arson, it's the same company.
>
> Person 2 chose not to participate and denied – denied the offer from Mr. Schwartz and reported this incident to law enforcement.

(*Id.*, PageID 90-92). Special Agent Watson explained that Person 2 was particularly fearful of Defendant. Specifically, in 2018 Defendant instructed Person 2 to come to his (Defendant's) house with a gun. Person 2 got into Defendant's truck, along with a third unidentified person, and the three drove to the residence of someone who owed Defendant money. Person 2 observed that Defendant had a gun. During the ride, Person 2 explained that Defendant instructed the

6

third, unidentified person, something to the effect of "We're going to get our -- excuse me -- effing money no matter what, even if you have to effing shoot him." (*Id.*, PageID 92). Person 2 reported that, fortunately, the target of Defendant was not home when they got to his residence, and that Defendant decided instead to file a civil suit.

In addition, SA Watson observed a pattern of Defendant being wary of recording devices and asking others to leave phones behind when speaking with him, demonstrating his attempts to avoid investigation. (Id., PageID 93-94). This included an instance in which Defendant actually patted down Person 1 to search for recording devices before answering a specific question about a possible arson, and affirmed that he also did the same thing when speaking with Conspirator 1. (Id., PageID 94). They then went on to discuss how Person 1 might profit from an arson, with Defendant making no attempt to discourage this, and instead asking that it be kept out of his name, and suggesting it be put in a specific other individual's name. (*See* Aff., Pg. 10).

Finally, Special Agent Watson explained that he recently learned that, after Defendant's arrest, Defendant's brother has confronted two witnesses in the case, calling one a snitch, and telling the other that "he's got something coming for him." Both witnesses took these encounters as threats directly related to Defendant's recent arrest. (*Id.*, PageID 99).

    2.  <u>Defendant's Cross-Examination and Evidence Proffer</u>

Defendant's cross-examination of SA Watson focused largely on Person 3's having previously been in a relationship with Defendant, and having been unhappy when he ended their relationship and married his current wife within a matter of days. (*E.g.* Doc. 18, PageID 119). As SA Watson explained, a past relationship is always a reason to look more carefully at a witness's statements, but Person 3's statements appeared to be credible for multiple reasons: (1) they were corroborated by "multiple other witnesses"; (2) she had not taken easy opportunities to embellish her statements in ways that would be more harmful to Defendant; (3) she was careful

7

to do just the opposite, such as when she explained how she initially viewed his threat as joking; and (4) that she actually indicated she was hesitant to advance the investigation because "she doesn't want to see him get in any more trouble." (*Id.*, PageID 127-128).

Defendant also elicited that, while SA Watson has testified to the pattern of Defendant's avoiding the possibility of being recorded, on one occasion it was the other individual (Person 1) who had asked Defendant to leave Defendant's phone behind. This fact had, of course, been set forth in the complaint affidavit, and it was Defendant who, despite that, still patted down Person 1 for a recording device when Person 1 was, in fact, wearing a recording device. (Aff., Pg. 10).

Defendant's evidence proffer was brief and largely comprised argument and a recitation of biographical facts in the pretrial services report (Doc. 18, PageID 130-133), but he proffered some factual content. He offered information about his age, limited criminal history, and the fact that he is employed. (*Id.*, PageID 130). He proffered that he has two minor children, several employees, and that there is no evidence of Defendant's flight to date. (*Id.*, PageID 130-31). He explained that he has stage 4 kidney failure, and proffered exhibits from the Cleveland Clinic.[2] (*Id.*, PageID 131-32). Finally, Defendant noted his involvement with religious activities. (*Id.*, PageID 133).

---

[2] While the Court's hearing minutes indicate that no exhibits were admitted, the government does not object to the Court considering defense exhibits D – G, but will submit those exhibits to the Court separately, due to the potentially confidential nature of the medical records in exhibits D – F and the confidential nature of the pretrial services report (exhibit G). The government believes that the reference in the minutes to not admitting exhibits concerns the Magistrate Judge Burke's finding that proposed exhibits A – C should be withdrawn because "they do not appear to be pertinent to the hearing, nor do they appear to have been submitted for a proper purpose." (Doc. 18, PageID 73).

3. The United States' Arguments for Detention

The United States then argued that Defendant poses a danger to the community, particularly focusing on the risk of obstruction of justice. The United States pointed to the fact that this case relates to drug trafficking conduct, even though Defendant is not charged with any specific drug counts. Likewise, the United States referred to the strength of the evidence against Defendant, which includes not only several witness statements, but Defendant's own admissions "that he fraudulently set up real estate transactions, accepting large amounts of cash, falsely reporting the purchase price to the state, and creating fake contracts are all highly incriminating." (*Id.*, PageID 134-35; *see also* Aff., Pg. 5-6).

Addressing the history and characteristics of Defendant, the United States conceded that he has a limited criminal history. (Doc. 18, PageID 135). However, the evidence presented at the hearing demonstrated his consistent use of violence and threats of violence to get his way. (*Id.*). The United States likewise argued that, if Defendant was willing to recruit two people to threaten or shoot someone just because of a financial debt, the Court should consider how far he will go now that he is facing a prison sentence:

> Well, of course, we have evidence when he has problems, and, here, what you have is his biggest problem to date, he is under federal indictment, he is in jail, and, this is the point, more than some dispute over some money, this is far more important to him, and given what he was willing to do in these other circumstances, he said with his own words to these other witnesses what he's willing to do to avoid going to jail, he's willing to kill Person 3 and bury her on his property, he's willing to pay someone to kill the lead investigator of the money laundering and the arson, and more to the point, he's willing to orchestrate an arson just for money, so highly dangerous activity, the use of threats of violence involving guns.

(*Id.*, PageID 135).

9

The United States addressed Defendant's medical conditions and noted that Defendant's proffered exhibits only called for additional access to water. The exhibits did not articulate any concerns about NEOCC's ability to care for Defendant's medical conditions. Further, in addressing Defendant's employees, the United States argued that his business is central to the arson and money laundering allegations. (*Id.*, PageID 139).

Finally, relating to Defendant's risk of flight, the United States argued that Defendant has obtained large amounts of money, both in cash drug proceeds in the money laundering scheme—during which he collected hundreds of thousands of dollars in cash from Marc Mahoney (*see* Aff., Pg. 8 ("approximately $330,000 to $340,000"))—and during the large insurance payouts related to the arson—at least $1.1 million, with additional coverage to $1.3 million, on a $130,000 property purchase (Doc. 18, PageID 86, 97). Furthermore, Defendant laughed and bragged during a recorded conversation about how he was not stupid enough to keep all of his money in a safe, leaving him with unknown amounts of cash drug proceeds at his disposal were he to flee. (*Id.*, PageID 140).

### 4. Defendant's Arguments for Bond

Defendant's argument focused largely on an effort to minimize the evidence of threats and violence presented by the United States, casting the evidence as unreliable hearsay. He argued that he "works his butt off," and provides employment opportunities for others. (*Id.*, PageID 143). Defendant argued that his money was legitimately obtained, and that access to money does not equate to a risk of flight. (*Id.*). Defendant did not address the United States' evidence that Defendant tried to hire someone to kill one of the federal agents investigating him.

### 5. The Pretrial Services Officer's Views

Magistrate Burke then turned to the Pretrial Services Officer, who expressed concern about the threats of violence, and who indicated that should the Court release Defendant, it

should be pursuant to an order of home detention, and that all firearms should be removed from his residential compound. (*Id.*, PageID 146-48). The Officer did not explain how the conditions would affect the concern about the threats.

      6.    The Court's Release Order and Stay of the Order Pending this Appeal

Magistrate Burke then ordered Defendant released on a secured $50,000.00 bond. (*Id.*, PageID 151-52). In addition to the standard conditions of release, Magistrate Burke ordered that all firearms be removed from the residence, and Defendant be subject to home confinement. (*Id.*, PageID 152).

The United States noted its objection to the order of release and moved the Court to stay its order pending this appeal. (*Id.*, PageID 156). Magistrate Judge Burke stayed the release order.

The United States respectfully requests that this Court review Magistrate Burke's order of release, revoke that order, and detain Defendant pending trial.

**III.**    **ARGUMENT**

Pursuant to Title 18, United States Code, Section 3145, "If a person is ordered released by a magistrate, or by a person other than by a judge of a court having original jurisdiction over the offense . . . the attorney for the government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1).

    A.    STANDARD OF REVIEW.

District Courts exercise a de novo review of a magistrate judge's release or detention order. *United States v. Fitzhugh*, 2016 WL 4727480 (E.D. Mich. Sept. 12, 2016) (citations omitted); *United States v. Eckenrode*, 2013 WL 257052 (N.D.Ohio Jan. 23, 2013) ("A District Court reviews the release order of a Magistrate Judge de novo."). The District Court is not

constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985) (citing *United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir.1981)). Furthermore, the District Court may hold an evidentiary hearing when reviewing the magistrate's bail decision. *Id.*; *see also United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988) (holding that the District Court "may conduct an evidentiary hearing" as part of its review).

      B.      THE FACTORS WEIGH IN FAVOR OF DETENTION.

The Bail Reform Act requires courts to detain a defendant pending trial when "no condition or combination of conditions will reasonably assure the appearance of the person . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); see also, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995) (either flight risk or danger to the community supports detention; proof of both is unnecessary). Risk of flight must be proved by a preponderance of the evidence, while dangerousness must be shown by clear and convincing evidence. *See United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985) ("clear and convincing standard applies only to" dangerousness finding).

The district court must consider four factors to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community: (1) the nature and circumstances of the crime charged, including whether it involves a firearm or a controlled substance offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that defendant's release would pose. 18 U.S.C. § 3142(g).

1. <u>The nature and circumstances of the offense</u>

Section 3142 instructs that the Court should consider whether the offense charged *involves* a controlled substance or a firearm. 18 U.S.C. § 3142(g)(1) (emphasis added). The United States concedes that Defendant was not charged with an offense under Title 21 of the United States Code. However, he is charged with a conspiracy to launder cash proceeds of cocaine sales. Additionally, while addressed further below, this Court should consider Defendant's access to firearms in conjunction with his repeated threats of violence to witnesses, and the steps he took to recruit Person 2 to kill DEA TFO Taylor Cleveland.

Moreover, these offenses carry substantial sentences, a factor that weighs in favor of detention because it increases the likelihood that the defendant will fail to appear. *United States v. Bothra*, No. 19-1092, 2019 U.S. App. LEXIS 9375 (6th Cir. Mar. 28, 2019) (considering the length of the possible sentence relative to the risk of flight). Accordingly, the nature and circumstances of the offense support that the defendant is a flight risk and a danger to the community, and, therefore, this factor weighs in favor of detention.

2. <u>The weight of the evidence</u>

This factor relates to the weight of the evidence of dangerousness or risk of flight, not to the weight of the evidence of the defendant's guilt. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). While the United States submits that the underlying evidence of his guilt is strong, and therefore leads to a motivation to flee, this Court's consideration here should focus on his danger to the community, risk of flight, and especially the risk of obstruction.

The United States presented significant testimony at the detention hearing that Defendant has repeatedly threatened others with violence. Defendant instructed Person 2 to bring a gun and come with him to confront someone that owed him money, emphasizing that he did not care if the target was shot in the head. This, of course, took place in the context of a business dispute.

13

Next, he threatened to bury Person 3 on his property if word got out about the arson. At this point—particularly after SA Watson testified that Conspirator 1 has "admitted to intentionally setting the fire at Mr. Schwartz's direction" (Doc. 18, PageID 99)—the word is out, the witnesses against him are stacking up, and there is no telling what he will do if given the opportunity to retaliate or prevent further statements to law enforcement.

Finally, when confronted with an official investigation into his criminal conduct, the defendant propositioned Person 2 to kill Detective and TFO Taylor Cleveland. Defendant has consistently showed his willingness to resort to violence to protect himself and his business, and an order of release provides him with the opportunity to act.

3. <u>Defendant's history and characteristics</u>

In assessing whether this factor weighs in favor of detention, the statute identifies eleven nonexclusive areas for the court's consideration. Those areas are (a) the defendant's character; (b) his physical and mental state; (c) his family ties; (d) his employment; (e) his financial resources; (f) the length of residence in the community/community ties; (g) past conduct; (h) history relating to drug or alcohol abuse; (i) criminal history; (j) record concerning appearance at court proceedings; and (k) whether, at the time of the current offense or arrest, the person was on probation, parole, or other release pending trial, sentencing appeal, or completion of a sentence. 18 U.S.C. § 3142(g)(3).

The United States concedes that Defendant has a limited criminal history, and has significant community and family ties to Northern Ohio. Importantly, multiple Circuits have found that family ties and residence, alone, are plainly insufficient to warrant release. *See, e.g.*, *United States v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir. 2001) (finding that strong community ties may be relevant to determining whether the defendant is a flight risk, but "does not outweigh the presumption of dangerousness"). Simply put, his business and his family may be reasons he

14

would not abscond, but they appear to be additional motivation for Defendant to continue to attempt to obstruct through threats and violence, as he has all the more to lose from a conviction and sentence. Further, all of Defendant's criminal conduct, including the threats of violence, have taken place in the greater Conneaut area, and all while Defendant has cared for his juvenile children. Those factors, often considered positive in the detention setting, have done nothing to deter him from engaging in the dangerous behavior at issue here.

Likewise, while Defendant emphasized his employment and those who work for him, he failed to acknowledge how all of his criminal conduct, ranging from misrepresenting the terms of a land purchase to disguise the nature of drug proceeds, to burning down a building to collect a significant insurance payout, to the numerous violent threats, all relate back to his business and his employment of others. All of the allegations against Defendant—supported by uncontroverted evidence offered at the detention hearing—stem directly from how he conducts his business. To that end, this factor weighs against release.

While Defendant submitted evidence about his kidney condition, Magistrate Burke appropriately considered the evidence and found that nothing in Defendant's medical exhibits "indicates that his medical issues could not be addressed while he is at NEOCC." (Doc. 18: Det. Hrg. Trans., Page ID 151). This factor does not weigh in favor of release.

    4. <u>The nature and seriousness of danger that the defendant's release would pose</u>

The evidence at the hearing showed that Defendant routinely engaged in unscrupulous business dealings, some of which posed an actual danger in the form of arson. More to the point, Defendant is willing to resort to violence to get his way, and uses others to do his biddings. He now faces a federal indictment, and is on alert of potential additional charges for the arson and

15

fraud investigation, for which many of the same witnesses have offered evidence that incriminates him in both crimes.

Defendant will point to the conditions that have been set for his release—electronic monitoring with home confinement, and remove firearms from the home and other properties he controls—as assuring the safety of the community and witnesses. But nothing about those conditions would prevent Defendant from, as he has done repeatedly before, making and carrying out threats or violence through third parties. It was, after all, *Defendant* who argued that electronic monitoring and home confinement would not stop him from running his company because Defendant "can negotiate contracts with people . . . , he can make arrangements, phone or internet, to obtain supplies, and then he can send employees out to the job." (*Id.*, PageID 148).

What's more, the condition requiring removal of firearms, while a positive step, assures very little, as there is no accounting of the total number of firearms at his disposal, let alone those the disposal of anyone he might contact by "phone or internet" to do his bidding. While 45-60 guns were observed at his home, he had very recently bragged—on consensually recorded conversation—about having 100 firearms, and also bragged about telling the same detective whose murder he tried to procure, "if I was going to shoot you, you'd be dead already a--hole." (Aff., Pg. 10).

The evidence of Defendant's threats and solicitation of a murder for hire is one sided and uncontroverted. The most Defendant has offered is vague allegations of bias by one of the witnesses. Defendant has previously faced a potential loss of money, which resulted in one instance in his plans to shoot someone in the head if needed, and in another instance in burning down an investment property. When the clouds of potential consequences from that arson began

to gather, he threatened to kill a witness. Finally, when he learned that Det. Cleveland was investigating his money laundering, he solicited a murder for hire to stop the investigation. Now, the consequences of his crimes are more present and more serious. Considering his inclination to use violence to avoid even the specter of such consequences, or even mere financial loss, this Court should take great caution in releasing him back to the community, where he can continue to pose a threat. This factor clearly weighs in favor of detention, and nothing in the combination of conditions imposed would prevent him from continuing to obstruct justice, including through threats and violence.

The threats and potential obstruction here are far greater than a recent case in which the Sixth Circuit affirmed this Court's order detaining the defendant due to concerns about attempts to obstruct the investigation. *See United States v. Johnson*, No. 18-3348, 2018 U.S. App. LEXIS 26385, at *2 (6th Cir. 2018). Unlike here, the defendant, Aesha Johnson, had been charged only with white collar crimes with no connection to drugs—conspiracy to commit wire fraud, wire fraud, and aggravated identity theft. *Id.* at *3. The evidence was that she then threatened and encouraged a co-conspirator "to avoid leaving any trace of their conduct." *Id.* at *4. The circuit also found it significant that, similar to here, she faced up to 20 years imprisonment on the wire fraud, with a possible additional 2 years for the identity theft. *Id.* While that defendant's criminal history and the fact that she committed the offenses while incarcerated also weighed against her, the focus was on her attempt to obstruct justice. *Id.* But the threats there were not nearly so serious as these, and not coupled with evidence of an arson and an attempt to contract the murder of the lead investigator. Still, this Court ordered her detained, and the circuit affirmed the detention order. The court should detain Defendant here for the same reasons, and more.

17

**IV.** **CONCLUSION**

Based on the foregoing, the Government requests that the District Court review Magistrate Judge Burke's release order, revoke that order, and detain Defendant pending trial.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: /s/ Robert J. Kolansky
Robert J. Kolansky (PA: 316899)
Elliot Morrison (OH: 0091740)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3780 / 3919
(216) 522-8355 (facsimile)
Robert.Kolansky@usdoj.gov
Elliot.Morrison@usdoj.gov